**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 83976-4-I |
| Respondent, | (Consolidated with No. 83977-2-I) |
| v. | DIVISION ONE |
| MICHAEL WILLIAM BIENHOFF, KARL EMERSON PIERCE, and each of them, | UNPUBLISHED OPINION |
| Appellants. | |

FELDMAN, J. — Michael Bienhoff and Karl Pierce (collectively defendants) appeal their convictions of first-degree felony murder. We reverse and remand to the trial court to consider whether to impose restitution interest on defendants under RCW 10.82.090 and strike the Victim Penalty Assessment (VPA) fees on defendants' judgments and sentences. We affirm in all other respects.

FACTS

Defendants were initially convicted of first-degree felony murder in 2015. The convictions were reversed by this court, and our Supreme Court affirmed the result based on instructional error. *State v. Pierce*, 195 Wn.2d 230, 244, 455 P.3d 647 (2020). This appeal stems from the second trial and subsequent convictions.

At the new trial, there were two competing narratives for the events that gave rise to the charges: defendants asserted that they were the victims of an attempted robbery that resulted in the death of Precious Reed; and the State asserted that defendants were the perpetrators of an attempted robbery that resulted in the death of Reed. At the conclusion of the trial, the jury convicted defendants of first-degree felony murder (RCW 9A.32.030(1)(c)) with a special finding that defendants committed the crime while armed with a firearm (RCW 9.94A.533(3)). The trial court sentenced Bienhoff within the standard range plus 60 months for the firearm enhancement for a total of 515 months and sentenced Pierce within the standard range plus 60 months for the firearm enhancement for a total of 505 months.

Defendants appeal.

ANALYSIS

Comment on the evidence

Defendants argue on appeal that the trial court impermissibly commented on the evidence. The alleged error came at the end of the eighth day of trial, when the trial court gave an instruction to the jury to not do any independent research outside the courtroom with regard to the case:

> [THE COURT]: (To the jury) Once again, please do not do any research. Please do not do any talking or listening to anybody about anything you've heard about this case so far or anything that might be related to this case. *We still have plenty of the trial to go and I am confident that your questions will be answered by testimony and evidence to be presented.*

(Emphasis added.)  Defendants claim that the italicized text constitutes an impermissible comment on the evidence because the court's assurance may have caused the jury to view the evidence through a lens more "favorable to the prosecution than the defense," arguing the statement implied the trial judge believed the prosecution would meet its burden of proof.

Because defendants failed to object to the alleged error below, they may raise the argument for the first time on appeal only if they can demonstrate "(1) the error is manifest, and (2) the error is truly of constitutional dimension." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009).  Defendants' argument is premised on article 4, section 16 of the Washington State Constitution, which states that "Judges shall not charge juries with respect to matters of fact, nor comment thereon."  Thus, the alleged error is of constitutional dimension.  To be manifest, the alleged error must have practical and identifiable consequences apparent on the record that should have been reasonably obvious to the trial court.  *O'Hara*, 167 Wn.2d at 108.  A juror could potentially interpret a statement that their questions would be answered, in isolation, as implying that the testimony and evidence to come will eliminate any reasonable doubt that defendants are guilty.  For that reason, such a statement should be avoided in favor of specific instructions not to perform outside research.[1]

---

[1] The pattern instruction on this issue is set forth in 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.61, at 137 (5th ed. 2021), which states in relevant part as follows: "Do not read, view, or listen to any report from the newspaper, magazines, social networking sites, blogs, radio, or television on the subject of this trial. Do not conduct any internet research or consult any other outside sources about this case, the people involved in the case, or its general subject matter. You must keep your mind open and free of

3

But when viewed in context, the alleged error is neither apparent nor reasonably obvious as required to raise the argument for the first time on appeal. The context of the statement during the course of trial shows that the statement amounted to a routine and proper admonition that jurors not perform research outside the evidence admitted at trial. The challenged statement was one instance of a repeated routine instruction to the jury at the conclusion of each trial day instructing the jury to not conduct outside research or talk about the case. In addition, the trial court judge gave the following instruction at the beginning and closing of the trial:

> The State Constitution prohibits a trial judge from making any comments on the evidence. It would be improper for me to express by my words or conduct my own personal opinion about the value of any testimony or other evidence, and I have not intentionally done that.
>
> If it appears to you, or has appeared to you, that I have indicated my personal opinion in any way either during trial or in giving these instructions, you must disregard that entirely.

The full context explains the import of the trial judge's emphasis on "the testimony and evidence to be presented" in the challenged comment, which was to caution the jury against consulting any information other than the trial evidence. As a result, any alleged constitutional error is not manifest and we decline to address this argument under RAP 2.5(a).

---

outside information. Only in this way will you be able to decide the case fairly based solely on the evidence and my instructions on the law."

Ramon Lyons video

Defendants next argue that the trial court abused its discretion when it admitted a video of a state witness, Ramon Lyons, having a mental breakdown and attempting suicide after police interrogated him about his involvement in the attempted robbery and death of Reed. We disagree with defendants' argument; the trial court did not abuse its discretion in admitting the video and any error was harmless.

Before trial, Lyons pled guilty to manslaughter in the first degree for his participation in the events that led to the death of Reed. At trial, Lyons testified on direct examination he had not planned a robbery and knew nothing about a plan:

> Q: So just to be clear, Mr. Lyons, if we understand your testimony correctly, you're saying you knew nothing about a plan; is that right?
> A. No, there wasn't no plan.
> Q. All right. So on February 20th, 2012, you're telling us that Mr. Bienhoff just called you out of the blue, correct?
> A. (No audible response.)
> Q. Yes?
> A. Yes.

After Lyons testified in this fashion, the State sought to attack his credibility by showing he had a mental breakdown and attempted to commit suicide when interrogated about his involvement in the events that led to Reed's death. The State argued that this conduct shows consciousness of guilt and thus refutes Lyons' assertion that there was no plan to rob Reed.

This conduct was captured on a lengthy video, which starts with Detectives Norton and Mudd questioning Lyons about his involvement in the events that led to Reed's death.  After about thirty minutes of repeatedly denying any involvement in the events that led to Reed's death, the police left Lyons alone in the interrogation room.  Once alone in the room, Lyons proceeds to have a mental breakdown.  He pours soda on his face, falls off his chair, begins to vomit, and remains horizontal on the floor sobbing until the fire department arrives.  Once fire department personnel arrive, they sit him up, but Lyons falls back to the ground, grabs the soda can from the floor, tears it in half, and moves one half of the can towards his throat.  The fire department personnel quickly react and take the torn soda can from his hand.  The trial court admitted the video over defendants' objection.

We review the trial court's decision to admit this video for abuse of discretion and defer to the trial court's ruling "unless no reasonable person would take the view adopted by the trial court." *State v. Clark*, 187 Wn.2d 641, 648, 389 P.3d 462 (2017) (internal quotation marks omitted) (quoting *State v. Atsbeha*, 142 Wn.2d 904, 914,16 P.3d 626 (2001)).  The credibility of a witness may be attacked by any party, including the party calling the witness.  ER 607.  Evidence is relevant and potentially admissible to attack a witness's credibility if it tends to cast doubt on the credibility of the witness and if the witness's credibility is a fact of consequence to the action.  *State v. Allen* S., 98 Wn. App. 452, 459-60, 989 P.2d 1222 (1999).  Here, Lyons testified that he "knew nothing about a

6

plan," which tends to exculpate defendants. Having so testified, Lyons' credibility is clearly a fact of consequence to the action. The State, therefore, could properly attack his credibility.

We must next determine whether the video of Lyons' interrogation is relevant and admissible to attack his credibility. Washington courts have found several forms of conduct to be relevant and admissible to attack a witness's credibility because they allow a reasonable inference of consciousness of guilt. Examples include giving false information to the police (*State v. Chase*, 59 Wn. App. 501, 508, 799 P.2d 272 (1990)), making threatening gestures toward a witness (*State v. McGhee*, 57 Wn. App. 457, 460-61, 788 P.2d 603 (1990)), and flight from the crime scene (*State v. Hebert*, 33 Wn. App. 512, 515, 656 P.2d 1106 (1982)). "[E]vidence of resistance to arrest, concealment, assumption of a false name, and related conduct are [also] admissible if they allow a reasonable inference of consciousness of guilt of the charged crime." *State v. Freeburg*, 105 Wn. App. 492, 497-98, 20 P.3d 984 (2001). Critical here, "a majority of U.S. courts have . . . held that evidence of suicide and attempted suicide is admissible as relevant to a defendant's consciousness of guilt, often analogizing suicide evidence to flight evidence." *State v. Martin*, 146 Hawai'i 365, 382, 463 P.3d 1022 (2020).

Because Lyons' credibility was a fact of consequence to the action and his prior conduct could properly be offered to attack his credibility by showing consciousness of guilt, the trial court did not abuse its discretion by admitting the

video showing Lyon's mental breakdown and attempted suicide. While it may be argued persuasively that the video is inconclusive evidence of consciousness of guilt, we may only find an abuse of discretion where "no reasonable person would take the view adopted by the trial court." *Clark*, 187 Wn.2d at 648. A reasonable person could potentially view the video as Lyons' attempted suicide to avoid arrest, prosecution, and punishment for his unlawful conduct and thus evidence of consciousness of guilt. The trial court, therefore, did not abuse its discretion in admitting the video to attack Lyons' credibility.

Moreover, even if the trial court abused its discretion, its evidentiary ruling was harmless. "An error in admitting evidence that does not result in prejudice to the defendant is not grounds for reversal." *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). Non-constitutional evidentiary error "is harmless unless there is a reasonable probability, in light of the entire record, that the error materially affected the outcome of the trial." *State v. Webb*, 64 Wn. App. 480, 488, 824 P.2d 1257 (1992). A "'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *State v. Chavez*, 76 Wn. App. 293, 297, 884 P.2d 624 (1994) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1995)).

Here, admitting the video was harmless for two reasons. First, there was substantial other evidence to attack Lyons' credibility. Hiram Warrington, a witness for the State, lived in Lyons' home at the time of the murder. During Lyons' direct examination, he testified that he did not see Warrington the day of

8

the murder and did not have conversations with him about the events that led to Reed's death. To attack Lyons' credibility, the State elicited testimony from Warrington that he saw Lyons leave the house with a gun on the day in question and saw Lyons return to the house at 2:00 or 3:00 a.m. the next day where Lyons and Warrington spoke about what had occurred.

Second, there was also ample other evidence to convict defendants of first-degree felony murder. For example, Scott Barnes, an individual who pled guilty to robbery in the first degree for his role in the murder, testified that he anticipated a robbery was going to take place. He further testified that Bienhoff said in the car while leaving the crime scene that he "may have killed [Reed]." Also, Barnes testified that Pierce said he had "let off several rounds into a Cadillac." Warrington also testified that when Lyons returned home the night of the murder, Lyons told Warrington their intent was to rob Reed and detailed a plan to get rid of the evidence:

> He said that all of them were supposed to take their clothes and their gloves and their masks and the weapons and go -- just like get rid of them. And he gave me two places: I don't know if this to be true or not, but this is what he said was to put it in one of those drain holes, like a sewer thing. One was at Bitter Lake and then the other one was to disperse of it at the Carkeek Park beach in the ocean.

Because of the ample other evidence admitted to convict defendants of first-degree felony murder, as well as the other evidence to attack Lyons' credibility, any evidentiary error in admitting the video of Lyons was harmless.

GR 37 Violation

9

Pierce alone argues that the trial court erred by failing to apply the correct test for determining whether Bienhoff's peremptory strike of juror 80 violated GR 37. The State concedes that the trial court failed to apply the correct test to the State's GR 37 objection, but argues that Pierce invited the error and is therefore prohibited from now complaining of it on appeal. We agree with the State's argument.

After Bienhoff exercised a peremptory strike for juror 80, an Asian woman, the State immediately raised a GR 37 objection. Bienhoff said his primary reason for striking this juror was that "she said that she can't be impartial." The prosecutor noted, "I don't have anything in my notes about her saying that she had difficulties being impartial." The judge agreed and said his notes did not support that juror 80 "would have trouble being impartial." The court asked Pierce's attorney, "did you want to say anything?" Pierce's attorney responded, "Well, I believe it was on her questionnaire where she said she'd have philosophical or religious reasons that might interfere with her ability to be impartial."[2] The court rejected the GR 37 objection and said, "I will excuse Juror 80 based on the peremptory challenge." The court ruled there were reasons "besides" bias to use a peremptory strike against her. Among the other reasons the trial court noted were that juror 80 said she felt "unsafe coming downtown . . .

_____

[2] Juror 80 answered yes to the following question in the juror questionnaire: "Do you have religious or philosophical views that may cause you to feel uncomfortable sitting as a juror in a criminal case involving the charges alleged with respect to the defendants in this case?"

10

as an Asian woman" and her responsibilities for taking care of her 93-year-old brother.

As Pierce argues and the State concedes, the trial court failed to apply the correct test when assessing the State's GR 37 objection. The trial court ruled that there were other reasons "besides" bias to use a peremptory strike against juror 80. But that is not the correct test to determine whether to sustain the State's GR 37 objection. Rather, the trial court was required to analyze whether "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." GR 37(e). Because the trial court's ruling left room for racial or ethnic bias to be a possible factor behind Bienhoff's use of the peremptory strike, we agree with Pierce and the State that the trial court erred in this regard.

But the trial court's error was invited by Pierce. The invited error doctrine "prohibits a party from setting up an error at trial and then complaining of it on appeal." *State v. Henderson*, 114 Wn.2d 867, 870-71, 792 P.2d 514 (1990). This is true even where constitutional issues and constitutional rights are involved. *Id.* at 871. The doctrine is designed to prevent a party from misleading the court and then receiving a windfall by doing so. *State v. Momah*, 167 Wn.2d 140, 153, 217 P.3d 321 (2009). To determine whether the invited error doctrine applies, courts consider whether the complaining party affirmatively assented to the error, materially contributed to it, or benefited from it. *Id.* at 154.

11

Even though the trial court erred when it failed to apply the correct test to the State's GR 37 objection, Pierce invited the error and therefore is prohibited from complaining of it on appeal. When asked whether Pierce had anything to add to the State's GR 37 objection, Pierce directed the trial court to another reason—besides improper bias—to permit Bienhoff's peremptory strike of juror 80. The trial court then permitted Bienhoff's preemptory strike, and dismissed juror 80 upon concluding, just as Pierce had argued, that there were other reasons "besides" bias to excuse juror 80. Thus, Pierce assented to, materially contributed to, and then benefited from the trial court's error. As a result, we conclude that Pierce invited the error and cannot rely on it as a basis for reversal.[3]

Sentencing issues

Lastly, Pierce raises three additional issues regarding his sentence. Bienhoff joins in the second and third issue.

First, Pierce asks us to remand for the trial court to remove his prior juvenile felony adjudications of guilt because a recent amendment to RCW

---

[3] Following oral argument, Pierce submitted a statement of additional authority citing *State v. McCrea*, No. 37416-5-III (Wash. Ct. App. February, 20 2021) (unpublished), for the proposition that this court should address his GR 37 argument even if he expressly waived the issue. *McCrea* is distinguishable because there is no argument here, nor do we find, that Pierce waived his GR 37 argument. Instead, Pierce affirmatively assented to the trial court's error, materially contributed to it, and benefited from it by directing the trial court to a reason besides improper bias to permit Bienhoff's peremptory strike of juror 80. As a result, the invited error doctrine precludes Pierce's argument. The court in *McCrea* did not address any such argument. Pierce also argues "[i]f the errors during Mr. Pierce's trial are insufficient to require reversal when viewed in isolation, they undermine the fairness of the trial when viewed cumulatively." As discussed in the text, Pierce waived the first alleged error by failing to object to the trial court's instruction below, invited the second alleged error and therefore cannot complain about it on appeal, and failed to establish prejudice as to the third. Because Pierce has not met his burden to show multiple trial errors resulting in prejudice, his cumulative error argument also fails.

9.94A.525 provides that only juvenile adjudications of first- and second-degree murder and class A sex offenses will be included in an adult offender score. The State argues RCW 9.94A.345 and RCW 10.01.040 control and require that the "law in effect at the time of a crime must be applied to the imposition of sentence for that crime." We agree with the State.

RCW 9.94A.345 states that "any sentence imposed under this chapter shall be determined in accordance with the law in effect when the current offense was committed." And RCW 10.01.040 states, "Whenever any criminal or penal statute shall be amended or repealed, all offenses committed or penalties or forfeitures incurred while it was in force shall be punished or enforced as if it were in force, notwithstanding such amendment or repeal." Under these statutes, "sentences imposed under the [Sentencing Reform Act] are generally meted out in accordance with the law in effect at the time of the offense." *State v. Jenks*, 197 Wn.2d 708, 714, 487 P.3d 482 (2021).

Here, the legislature's recent amendment took effect July 23, 2023. LAWS OF 2023, ch. 415, § 2. It provides that "adjudications of guilt pursuant to Title 13 RCW which are not murder in the first or second degree or class A felony sex offenses may not be included in the offender score." *Id.* But under RCW 9.94A.345 and 10.01.040 (quoted above) and controlling case law, this amendment does not apply to pending prosecutions for crimes committed before the amendment's effective date unless the legislature "fairly convey[s] that intention" in the newly enacted statute. *Jenks*, 197 Wn.2d at 720 (quoting *State v.*

13

*Ross*, 152 Wn.2d 220, 238, 95 P.3d 1225 (2004)). None of the language Pierce cites in the new statute fairly conveys an intention for the law to apply to pending prosecutions. As a result, we cannot avoid a clear statutory directive to apply the law as it existed at the time when the current offense was committed. Accordingly, we reject Pierce's argument.

Second, defendants ask us to remand for the trial court to consider waiving interest on restitution. A recent amendment to RCW 10.82.090 provides that the superior court "may elect not to impose interest on any restitution the court orders" and that this determination shall be based on factors such as whether the defendant is indigent. LAWS OF 2022, ch. 260, § 12. Defendants argue that although this provision did not take effect until after their sentencing, it applies to them because their cases are still on direct appeal. We agree with defendants.

Division Two's opinion in *State v. Ellis*, 27 Wn. App. 2d 1, 530 P.3d 1048 (2023), is controlling on this point. Relevant here, the court held, "Although this amendment did not take effect until after Ellis's resentencing, it applies to Ellis because this case is on direct appeal." *Id.* at 16. The court therefore remanded the issue "for the trial court to address whether to impose interest on the restitution amount under the factors identified in RCW 10.82.090(2)." *Id*. We agree with Division Two's opinion in *Ellis* and conclude that the same reasoning and result apply equally here. We therefore remand to the trial court to address

14

whether to impose interest on restitution in defendants' judgments and sentences.

Finally, defendants argue that remand to the trial court to strike the $500 VPA from his judgment and sentence is required. They contend that recent amendments to RCW 7.68.035 provide that the VPA shall not be imposed against a defendant who is indigent at the time of sentencing. Laws of 2023, ch. 449, § 1. The State does not dispute that defendants are indigent and does not object to a remand for purposes of striking the VPA from their judgments and sentences. We accept the State's concession and, accordingly, remand for the superior court to strike the VPA fee from defendants' judgments and sentences.

We reverse and remand to the trial court to consider whether to impose restitution interest on Defendants under RCW 10.82.090 and strike the VPA fees on defendants' judgments and sentences. We affirm in all other respects.

Feldman, J.

WE CONCUR:

Birk, J.

Coburn, J.

15